Filed 8/30/13  In re R.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re R.M. et al., Persons Coming Under the Juvenile Court Law. | D063785 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12440A-B) |
| v. | |
| ROBERT M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Terence M. Chucas, under appointment by the Court of Appeal, for Minors.

Robert M. appeals juvenile court orders terminating his parental rights to his minor sons, R.M. and Diego M. (together the minors) under Welfare and Institutions Code[1] section 366.26. Robert contends the court erred by finding the beneficial parent-child relationship exception to adoption did not apply to preclude termination of his parental rights. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2010, one-year-old R.M. and two-month-old Diego became dependents of the juvenile court under section 300, subdivision (b), and were removed from parental custody because their mother, Maria C., abused drugs, had drug paraphernalia in the home, and had a history of untreated methamphetamine abuse, and the minors' father, Robert, had been unable to protect them from Maria's drug abuse. At the time, Robert was in jail on a parole violation. His extensive criminal history, dating to 2000, included crimes of violence. The court placed the minors in foster care, ordered the parents to participate in reunification services, and authorized supervised visits for the minors and Robert.

The San Diego County Health and Human Services Agency (Agency) informed the court that Robert and the minors were eligible for enrollment with the Oglala Sioux Tribe (the tribe). Throughout the proceedings, the court made findings that the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) applied. The tribe initially

---

[1]    Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

expressed its interest in intervening, but did not follow through. It later concurred with Agency's placement recommendation for the minors, and said it would intervene if the parents did not make timely progress with their reunification plans.

Robert was paroled from prison in January 2011 but, a week later, he was arrested for committing violent crimes. He contacted the minors at their foster home a few times, asked the social worker for photographs of them, and sent them birthday cards and notes. Agency arranged for Robert to visit the minors at the detention facility twice a month.

At the six-month review hearing, the court made findings in accordance with ICWA, continued the minors as dependents and ordered further reunification services for the parents. The court found good cause existed to modify the placement preferences of ICWA. Agency continued to evaluate paternal relatives for possible placement.

In October 2011, Robert had a telephone conversation and two visits at the detention facility with the minors. He was appropriate and loving with the minors, and R.M. interacted well with him. Robert was on lockdown during November 2011, and Agency was hampered in its efforts to schedule visits by the facility's restrictions and the status of Robert's criminal court proceedings.

At the 12-month review hearing, the court found active efforts had been made to provide services to the parents and to prevent the breakup of the Indian family as required by ICWA. The court terminated services and set a hearing under section 366.26 to select and implement a permanent plan for the minors.

In February 2012, Robert applied for membership in the tribe. According to the tribal representative, the tribe's preference was for the minors to be placed with paternal

3

or maternal family members, or in the home of an Indian family. The tribal representative further noted that because the minors were part Mexican, placement with the current foster parents, who were of Mexican descent, was acceptable to the tribe.

Agency assessed the minors as generally and specifically adoptable. The foster parents were committed to adopting them[2] and there were numerous families interested in adopting a sibling set like the minors. Robert had been incarcerated throughout most of the dependency proceedings and had not been able to develop a relationship with the minors. The social worker believed adoption was in the minors' best interests because they needed a permanent home.

In July 2012, the tribal representative informed the social worker that it was in the minors' best interests to remain in their foster home with their sister and to have the tribe pursue a tribal customary adoption. The following November, the tribe submitted to the court the paperwork for the tribal customary adoption.[3] However, the paperwork contained numerous errors that needed to be corrected, requiring the court to continue the matter.

At the continued hearing, the court was unable to contact the tribal representative, who was scheduled to appear telephonically. The parties had not been informed of the

---

[2]    The minors' half sister had been placed with these foster parents, who intended to adopt her.

[3]    Tribal customary adoption, not part of ICWA, was established by the Legislature as an alternative permanent plan for Indian children. (Stats. 2009, ch. 287, § 12.) It is an "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe. Termination of parental rights is not required to effect the tribal customary adoption." (§ 366.24, subd. (a)(1); see *In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.)

tribe's position. The court again continued the hearing after Agency noted the proceedings had gone beyond the statutory time frame, and Agency was unprepared to proceed with a traditional adoption without the declaration and testimony of an Indian expert. Minors' counsel wanted more time to determine whether the tribe had enrolled the minors.

In January and April 2013, the tribe informed Agency and the court that it had elected to withdraw its request for a tribal customary adoption. Although Agency learned Robert had been enrolled in the tribe, it was unable to confirm the minors' enrollment. Robert had been transferred to local custody, but had not yet had a visit with the minors.

At the contested selection and implementation hearing, Indian expert Phillip E. Powers testified the minors would be at risk of serious emotional and physical harm if they were returned to parental custody. He stated Robert had an extensive criminal history and was recently sentenced to prison for nine years. Powers testified adoption was in the minors' best interests. He also testified that terminating Robert's parental rights would not interfere with the minors' eligibility for membership in the tribe.

Social worker Jose Santana testified that while Robert was incarcerated, he had visits with the minors twice a month. Santana had observed six or seven of those visits, which occurred through a glass partition with the use of a telephone. R.M. recognized Robert, but Diego did not. When the minors first arrived at the visit, they would run around and scream. R.M. talked on the telephone to Robert for one to two minutes, and mostly listened to Robert talking. Robert watched the minors through the glass partition

5

and waved at them. Santana was not sure whether R.M. identified Robert as his father or only as someone he had seen before.

Santana further testified the foster parents were willing to continue any tribal traditions or customs for the minors. Although the minors were not yet enrolled in the tribe, Agency was committed to ensuring their enrollment.

After considering the evidence and arguments of counsel, the court made findings under ICWA, including: (1) active efforts were made to prevent the breakup of the Indian family, but those efforts were unsuccessful; and (2) continued custody of the minors by the parents was likely to result in serious emotional and physical damage to the minors. The court found the minors were likely to be adopted and none of the exceptions to adoption applied. The court terminated parental rights and referred the minors for adoptive placement.

## DISCUSSION

Robert contends the evidence was insufficient to support the court's finding the beneficial parent-child relationship exception to adoption did not apply to preclude terminating his parental rights. He asserts he maintained regular visitation and contact with the minors, and had an appropriate and bonded relationship with them, constrained only by his incarceration. Robert further asserts severing the parent-child relationship would be detrimental to the minors because he was their "only real link" to their Indian heritage.

6

A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P*. (2002) 104 Cal.App.4th 395, 401.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." We have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a

7

tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)

We review an order terminating parental rights for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

8

B

The juvenile court found, and the evidence showed, Robert's contact with the minors was "regular," given the circumstance of his incarceration. Nevertheless, Robert did not meet his burden of showing there was a beneficial parent-child relationship sufficient to apply the exception of section 366.26, subdivision (c)(1)(B)(i).

Robert was incarcerated throughout most of the minors' lives and consequently never developed a parental relationship with them. Even when Robert was out of custody on parole and was given referrals to services, he immediately resumed his criminal lifestyle and once again abdicated the role of parent. During visits twice a month at the jail facility, four-year-old R.M. recognized Robert, but not necessarily as his father, and appeared to enjoy the interaction with Robert through the glass partition and on the telephone. Two-year-old Diego did not know Robert. There was no evidence the minors asked for Robert between visits or were in any way adversely affected by his absence from their daily lives. "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Although Robert cared about the minors and expressed his love for them, this was not enough to show he had a " 'significant, positive, emotional attachment' " to them such that terminating the parent-child relationship would greatly harm them. (*In re Jason J.*, *supra*, 175 Cal.App.4th at pp. 936-938; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Further, Robert did not show that maintaining the parent-child relationship outweighed the benefits of adoption for the minors. The minors were living with their sister in the home of caregivers who were committed to adopting all of them. They looked to these caregivers to meet their physical, emotional and psychological needs. In the social worker's opinion, the minors' need for stability, safety and permanency outweighed any possible detriment that would be caused by severing the parental relationship. The court was required to, and did, weigh the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefit of an adoptive home for the minors. We do not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53.)

Contrary to Robert's position, a permanent plan other than adoption would not serve the minors' best interests because adoption is the only option that would provide them with the stability and permanence they need. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [Legislature has decreed guardianship is not in best interests of children who cannot be returned to their parents; only adoption affords the most permanent and secure alternative]; *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368-1370 [parents' preference to preserve family unit does not override best interests of minors in stability and security of adoptive home].) Substantial evidence supports the court's finding the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

C

Robert contends the court should have found that terminating his parental rights would be detrimental to the minors because he was their only connection to their Indian heritage. To the extent Robert is relying on the Indian child exception of section 366.26, subdivision (c)(1)(B)(vi), he has forfeited this argument by not raising it in the juvenile court. (*In re G.C., supra,* 216 Cal.App.4th at pp. 1398-1399 [father forfeited argument that court did not consider appropriateness of tribal customary adoption as minor's permanent plan].)

Even had Robert not forfeited the issue, there was no "compelling reason" for determining that termination of parental rights would not be in the best interests of these Indian children. (§ 366.26, subd. (c)(1)(B)(vi).) Under that provision, an exception to adoption for an Indian child may apply if terminating parental rights "would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights" or if the tribe has identified guardianship, long-term foster care with a relative, tribal customary adoption or another planned permanent living arrangement for the child. (*Id.*, subd. (c)(1)(B)(vi)(I).) According to Indian expert Powers, the minors would still be eligible for membership in the tribe once parental rights are terminated. Agency was committed to ensuring the minors become enrolled members of the tribe, and the caregivers were committed to teaching the minors about their tribal heritage. There was no evidence that terminating parental rights would substantially interfere with the minors' connection to the tribe or their tribal membership rights. Further, the tribe itself did not support a plan other than a traditional adoption by the caregivers and, in

11

fact, withdrew its request for a tribal customary adoption. Although Robert is unhappy with the tribe's decision and would prefer to retain his parental rights, he has not shown the juvenile court erred by finding adoption was in the minors' best interests.

DISPOSITION

The orders are affirmed.

McDONALD, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

12